**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
ENTERED

AUG 3 0 2006

Michael N. Milby, Clerk of Court

| | |
|---|---|
| IN RE: SEITEL, INC. SECURITIES LITIGATION | § § § **CONSOLIDATED CIVIL ACTION** § **CIVIL ACTION NO. H-02-1566** |

## ORDER

Pending before the Court is Defendant Ernst & Young's Motion to Dismiss the Second Consolidated Amended Class Action Complaint Against Ernst & Young Only under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(A), and Fed. R. Civ. P. 12(b)(6) **(Instrument No. 156)**, filed on September 27, 2005.

### I.

Lead Plaintiff, Dr. Russell Semeraro ("Plaintiff") brought this securities class action against Seitel, Inc. ("Seitel"), certain of its current and former officers and directors (the "Management Group"), and Ernst & Young LLP ("E&Y") alleging fraudulent accounting practices and false statements regarding the timing of revenue recognition, in violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.[1] Specifically, Plaintiff alleges, on behalf of himself and all other persons or entities who purchased Seitel common stock on the open market, other than Seitel, the Management Group, and E&Y, that during the period beginning on April 2, 2001, through May 3, 2002 (the "Class Period"), Seitel and

---

[1] The Court draws these background facts from the Second Consolidated Amended Class Action Complaint Against Ernst & Young Only. (Instrument No. 154).

E&Y materially misrepresented Seitel's results for the year ended December 31, 2000, by improperly recognizing revenues and thereby materially inflating Seitel's revenues and profits. Since the filing of this action, creditors of Seitel filed involuntary petitions for relief under Chapter 11 of the Bankruptcy Code, and Plaintiff entered into a settlement agreement with Seitel and the Management Group. However, Plaintiff continues the action against E&Y. On July 29, 2005, Plaintiff filed a Second Consolidated Amended Class Action Complaint Against Ernst & Young Only (the "Complaint").

Seitel is a Delaware corporation based in Houston that provides data and related geophysical services and expertise to the petroleum industry. (Instrument No. 154, at ¶ 13). At all relevant times, Seitel's common stock actively traded on the New York Stock Exchange, and, as is required of publicly-traded companies, Seitel filed quarterly and annual reports with the Securities and Exchange Commission ("SEC"). (*Id.* at ¶ 13). The Seismic Data Group of Seitel marketed licenses to seismic data from Seitel's library to the oil and gas industry. (*Id.* at ¶ 27). The Seismic Data Group formed the core of Seitel and generated more than 80% of Seitel's total revenue during the Class Period. (*Id.*). Seitel licensed data from its data library to its customers under four types of contracts; only one of those types – the "library card contracts" – is at issue in this case. (*Id.* at ¶ 30). Under the "library card contracts," the customer paid an up-front, non-refundable fee for access to specific data, for a specific period of time. (*Id.* at ¶ 32). During the period in which the customer had access to the data, the customers could then select certain data for a long-term possessory license. (*Id.* at ¶ 31).

Historically, Seitel recognized revenue from licensing of seismic data when it had a contract with its customer for a fixed sales price, a licensing agreement was in place, the seismic data was available for use by the customer, and collectibility of the sales price was reasonably assured. (*Id.*

2

at ¶ 121). Seitel did not defer recognition of library card revenue until the customer actually selected

or used the data made available. (*Id.* at ¶¶ 95, 121).

On December 3, 1999, the staff of the SEC issued Staff Accounting Bulletin 101 ("SAB

101"), *Revenue Recognition in Financial Statements*, which reiterated the accounting principle that

revenue should not be recognized until earned and that revenue is generally not earned until

"delivery has occurred or services have been rendered." (*Id.* at ¶ 33). The SEC required prospective

compliance with SAB 101, beginning no later than the fourth quarter of 2000. (*Id.*). SAB 101 also

summarized certain of the staff's views in applying Generally Accepted Accounting Principles

("GAAP") to revenue recognition in financial statements to ensure that registrants were in

compliance with the SEC's interpretation of GAAP. (*Id.*). For example, the SEC made clear that

registrants should apply SAB 101 unless there was "authoritative literature addressing a specific

arrangement or a specific industry" that was to the contrary. Specifically, SAB 101 states:

> If a transaction is within the scope of specific authoritative literature that provides
> revenue recognition guidance, that literature should be applied. However, in the
> absence of authoritative literature addressing a specific arrangement or a specific
> industry, the staff will consider the existing authoritative accounting standards as
> well as the broad revenue recognition criteria specified in the FASB's conceptual
> framework that contain basic guidelines for revenue recognition.

(*Id.* at ¶ 37).

On December 1, 2000, Seitel issued a Form 8-K disclosing that Seitel had replaced Arthur

Andersen LLP ("Andersen") with E&Y as its independent accounting firm. (*Id.* at ¶ 46). The Form

8-K further reported that Andersen and Seitel "did not have any disagreement on any matter of

accounting principles or practices." (*Id.*). However, according to a confidential source who was a

vice president in Seitel's Houston office until April 2002, Seitel dismissed Arthur Andersen as its

3

auditors because a new auditor from Andersen informed the President of Seitel, Paul Frame ("Frame"), and the Chief Financial Officer of Seitel, Debra Valice ("Valice"), among others, that Seitel's accounting violated GAAP, and "refused to sign off" on the audit. (*Id.* at ¶ 47). According to the vice president, the changes were not made, Andersen was dismissed, and E&Y was hired. (*Id.*).

The Complaint alleges that despite "SAB 101's clear guidance concerning non-refundable, up-front fee contracts such as Seitel's library card contracts, Seitel and E&Y justified Seitel's continued improper accounting by using (but not disclosing it was using) accounting standards that were specific to the <u>movie</u> industry and totally unrelated to Seitel's seismic data business. (*Id.* at ¶ 38) (*See* SOP 00-2 "Accounting by Producers of Distributors of Films.") For example, on December 21, 2000, E&Y created an Audit Strategies Memorandum for Seitel, stating as follows:

> The issue is when to recognize revenue on the sale of seismic data. Since there is not accounting literature specific to the seismic industry, we looked to a similar industry, the motion picture industry. We consider this to be a fair analogy as the seismic industry also created geological "movies" which are sold and resold under license agreements, while leaving an asset available for resale as long as a market exists.

(*Id.* at ¶ 38).

On February 13, 2001, Seitel's Audit Committee met and discussed E&Y's attitude toward Seitel's revenue recognition policies. (*Id.* at ¶ 54). Present at the meeting were members of Seitel's Audit Committee, and members of E&Y's local Houston office. (*Id.*). The Complaint alleges that "the minutes of that meeting indicate that there was 'considerable' discussion concerning revenue recognition issues, including SAB 101," and that E&Y assured the members of the committee that it "was not suggesting changes to revenue recognition, but rather pointing out the need for the Company to properly document and be able to support its revenue recognition policies." (*Id.*).

4

On March 5, 2001, Seitel issued a press release, announcing its purported financial results and performance for the fourth quarter and year ended December 31, 2000. The press release highlighted strong revenue from seismic data licenses, and reported that revenue had increased 27 percent for the year. Seitel's stock, which opened on the New York Stock Exchange at $20.00 per share on March 5, 2001, traded as high as $23.00 per share during the next couple of days. (*Id.* at ¶ 61-62).

On April 2, 2001, the commencement of the E&Y Class Period, Seitel filed an Annual Report on Form 10-K for the year ended December 31, 2000 (the "2000 Form 10-K"). The 2000 Form 10-K confirmed the favorable financial results that Seitel reported on March 5, 2001. (*Id.* at ¶ 69). Within the 2000 Form 10-K, E&Y issued an "unqualified" audit opinion on Seitel's December 31, 2000 financial statements.[2] (*Id.* at ¶ 70). According to the Complaint, E&Y's unqualified opinion falsely represented that Seitel's financial statements had been prepared in conformity with GAAP and that its audits had been conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). (*Id.*).

The Complaint further alleges that, within the 2000 Form 10-K financial statements that were the subject of E&Y's opinion, Seitel failed to describe adequately its revenue recognition policy for the data licensing contracts, failing specifically to mention that revenue was recognized on certain data licensing agreements prior to the customer having selected and been delivered specific data. (*Id.* at ¶ 71). In addition, the Complaint alleges that the 2000 Form 10-K, failed to reveal that the

---

[2] "An unqualified opinion, the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 643 n.17 (S.D.N.Y. 2004) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 n.13 (1984)).

5

accounting standards that Seitel actually followed were <u>movie</u> industry accounting rules and totally unrelated to Seitel's seismic data business. (*Id.* at ¶ 38, 71).

The 2000 10-K, in the subsection to Note A to the financial statements titled "Revenue Recognition," described Seitel's revenue recognition policy in relevant part as follows:

> Revenue from seismic data licensing agreements is recognized when each seismic data program is available for use by the licensees, and is presented net of revenue shared with other entities. Revenue received in advance of being earned is deferred until earned.

(*Id.* at ¶ 71). In the same subsection, Seitel assured investors that it had implemented SAB 101, stating:

> In December 1999, the staff of the SEC issued Staff Accounting Bulletin ("SAB 101"), "Revenue Recognition in Financial Statements." SAB 101 outlines the basic criteria that must be met to recognize revenue, and provides guidelines for disclosure related to revenue recognition policies. This guidance was required to be implemented in 2000. The Company implemented SAB 101 as of October 1, 2000 without a material impact on the quarterly or annual results of operations.

(*Id.* at ¶ 72).

The Complaint alleges that the description in the 2000 Form 10-K was false and misleading because it conveyed the impression that "Seitel had changed its accounting to comply with SAB 101, that this change in accounting was made as of October 1, 2000 (the first day it was required by the SEC to be implemented), and that although the change had <u>some</u> impact on Seitel's financial results, such impact was not 'material.'" (*Id.* at ¶ 75) (emphasis in original). The Complaint further alleges that Debra Valice, Seitel's CFO at the time of the 2000 Form 10-K, admitted, in an interview with plaintiff's counsel, that Seitel had not, in fact, implemented SAB 101 at the time, but that E&Y insisted that the 2000 Form 10-K include such language verbatim. (*Id.* at ¶ 72).

In October 2001, E&Y's national office subsequently questioned whether Seitel was required

to defer recognition of library card revenue until the customer selected or used the data made available. (*Id.* at ¶ 95). According to Seitel's Audit Committee Chairman, William Lerner, "these accounting issues . . . caused Seitel's management to become hostile to E&Y." (*Id.*). In early 2002, certain Wall Street analysts also began to question Seitel's revenue recognition accounting, and Seitel's stock price began to decline. In response, Seitel hired another independent auditing firm, Grant Thornton, to review Seitel's accounting policy. (*Id.* at ¶ 103). According to Valice, Grant Thornton's role was not as an independent accountant but was to help "improve the public image of Seitel," by working with Seitel on a "white paper" which explained and justified Seitel's revenue recognition practices. (*Id.* at ¶ 104).

On February 14, 2002, one of Seitel's main competitors, Petroleum Geo-Services ASA ("PGS"), announced that it would be restating its financial results for the fiscal years ended December 31, 2000, 1999 and 1998. One of the two aspects for this restatement related to improper revenue recognition under SAB 101 that was substantially similar to Seitel's "library card" contracts. (*Id.* at ¶ 105). PGS's restatement of revenues from "library card" contracts substantially similar to Seitel's caused the market price of Seitel shares to fall, further reducing the artificial inflation in Seitel shares. Thus, Seitel's closing price on February 13, 2002, the day before PGS's announcement, was $9.36 per share. Over the next two days, on higher than usual volume, Seitel's shares dropped almost 12% to $8.24 per share. (*Id.* at ¶ 106).

On April 1, 2002, Seitel issued a press release announcing that Seitel was restating financial results for the unaudited first three quarters of the year 2001, and for the year ended December 31, 2000, supposedly because it had "newly adopted more conservative and transparent accounting practices." (*Id.* at ¶ 114). According to the April 1, 2002 press release, Seitel restated and reduced

its revenue for the first nine months of 2001 by 30%, from $140.8 million to $98.1 million. The restatement for this period resulted in a net loss of $11.6 million rather than previously reported net income of $2.8 million. For the year ended December 31, 2000, Seitel restated and reduced its revenue by 15%, from $163.8 million to $138.3 million. The restatement for this period resulted in a net loss of $2.5 million instead of net income of $20.4 million. Of the $68.2 million in revenue reductions, $50.8 million related to revenues improperly recognized under seismic data access and license agreements. (*Id.* at ¶ 115).

In the April 1, 2002 press release, Seitel acknowledged that "as a result of the restatement" Seitel was not in compliance with certain financial covenants as of September 30, 2001, and December 31, 2001, and that Seitel was therefore not able to borrow under its line of credit facility. (*Id.* at ¶ 120). However, the press release minimized the impact of this news, explaining that "[t]he Company has received a waiver and an amendment from the Senior Note holders that places it in compliance with those agreements," and "[t]he Company has begun discussions with the lenders on [the] line of credit [facility] to amend the covenant calculations to bring Seitel back into compliance and to permit borrowing under the line of credit facility. (*Id.*). The release also stated that while Seitel was not "at this time in a position to offer reasonable projections of revenues and earnings for the first quarter, or for the full year," Seitel "expects that year-over-year revenues will be higher and that the Company will be profitable for FY 2002." (*Id.*). Thus, the Complaint alleges analysts had no reason to down grade the stock and Seitel and E&Y were able to continue to keep hidden the severe impact the restatement and the accounting change would have on Seitel going forward. (*Id.*).

On April 4, 2002, Seitel filed its Annual Report on Form 10-K for the year ended December 31, 2001 (the "2001 Form 10-K"). Contrary to Seitel's and E&Y's statement one year earlier, that

Seitel had implemented SAB 101 as of October 2000, Seitel admitted that it had not, in fact, implemented SAB 101, stating:

> Historically, Seitel recognized revenue from the licensing of seismic data when it had a contract with its customer for a fixed sales price, a licensing agreement was in place, the seismic data was available for use by the customer, and collectibility of the sales price was reasonably assured. . . . This accounting model has not changed with the adoption of the Securities and Exchange Commission's Staff Accounting Bulletin No. 101 (SAB 101), "Revenue Recognition in Financial Statements," in October 2000, because the Company and its auditors determined the SAB 101 guidance did not suggest a change in accounting policy.

> However, in February 2002, one of our industry colleagues announced a restatement of its 2000 financial statements for a change in accounting policy based upon SAB 101 . . . . In consideration of this industry change and upon further evaluation of SAB 101, the Company has determined that it is appropriate to adopt a more conservative approach to revenue recognition for the Company's data licensing contracts, and to recognize revenue at the time of data selection.

(*Id.* at ¶ 121; Instrument No. 156, Exh 2).

The dire effects of the restatement and Seitel's change to SAB 101 accounting continued to remain hidden until four weeks after the announcement of the restatement. (*Id.* at ¶ 124). On May 3, 2002, after the market closed, Seitel issued a press release and also filed with the SEC a Form 8-K. The May 3, 2002, release stated that "following its consultations with the SEC Staff during April 2002, the Company explains that its previously announced restatement of revenues in relation to certain seismic data access and license agreements is based on SAB 101." (*Id.* at ¶ 124). The May 3, 2002 press release and Form 8-K also revealed for the first time the severe effect Seitel's new, *proper* accounting was having on its reported revenues and financial condition. (*Id.* at ¶ 126) (emphasis in original). Thus the release stated that "due to increased interest expense and decreased revenues in the first quarter of 2002, the Company will not be in compliance with various covenants . . . as of March 31, 2002." (*Id.*). Significantly, the release warned that "[t]he Company's outside

9

auditors have advised that unless the Company successfully cures the non-compliance through amendments to the covenants, the auditors will include [a] 'going concern' qualification on any future report." (*Id.*).

The reaction to this news was swift. Seitel's shares, which had a closing price of $9.02 on Friday, May 3, 2002, before the issuance of the press release after the end of trading, fell to only $5.65 at the end of the day on Monday, May 6, 2002. On May 15, 2002, Seitel issued a press release reporting its results for the first quarter of 2002 (ending March 31, 2002). That press release reported a <u>net loss</u> for the quarter of $3.6 million compared to net income of $4.0 million in the first quarter of 2001, and revenue from the seismic division of $22.5 million compared to $30.2 million from the prior year's first quarter. (*Id.* at ¶ 127).

On April 26, 2002, Plaintiff commenced the present action against Seitel, members of Seitel's management, and E&Y alleging violations of the Exchange Act. (Instrument No. 1). On July 2, 2003, this Court administratively closed the action due to the filing of Seitel's involuntary petition for Chapter 11 bankruptcy. (Instrument No. 110). On March 18, 2004, the bankruptcy court entered an Order confirming Seitel's Plan of Reorganization and lifting the automatic stay effective August 13, 2004. (Instrument No. 115). On December 29, 2004, Plaintiff entered into a partial settlement of this action with Seitel and members of Seitel's management. (Instrument No. 115). On January 4, 2005, Plaintiff filed a Motion to Reinstate the action to the Court's active docket, and for preliminary approval of the settlement as a class action. (*Id.*). On February 3, 2005, this Court granted Plaintiff's Motion to Reinstate the action to the Court's active docket. (Instrument No. 123). On July 29, 2005, the Court granted final approval for class certification, and approval of the proposed partial settlement as against Seitel and members of Seitel's management only. (Instrument

No. 150). On the same day, Plaintiff filed its Second Consolidated Amended Class Action Complaint Against Ernst & Young Only. (Instrument No. 154).

In the Complaint, Plaintiff alleges that E&Y's audit violates Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Specifically, Plaintiff claims that "E&Y knew or was reckless in not knowing that its unqualified opinion accompanying Seitel's financial results in its 10-K for the year ended December 31, 2000, was materially false and misleading in that Seitel's financial statements did not comply with GAAP and E&Y's audit did not comply with GAAS." (Instrument No. 158, at 15).

On September 7, 2005, E&Y moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). (Instrument No. 156). Defendant contends that the Complaint fails to plead its allegations with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, and therefore fails to state a claim under Rule 12(b)(6). (*Id.*). Specifically, Defendant argues that the Complaint does not plead facts giving rise to a "strong inference" that E&Y acted with scienter. Defendant further argues that the allegations of the Complaint disprove a finding of loss causation and "fraud-on-the-market" reliance.

## II.

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such dismissals are to be viewed with disfavor and are rarely granted. *Shipp v. McMahon,* 199 F.3d 256, 260 (5th Cir. 2000) (quoting

11

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). They will only be granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*,355 U.S. 41, 45-6 (1957); *Oliver v. Scott,* 276 F.3d 736, 740 (5th Cir. 2002). Dismissal should not be granted unless the party would not be entitled to relief under any set of facts or any possible legal theory that could consistently be proven with the allegations in the complaint. *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).

In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the court accepts as true all allegations contained in the plaintiff's complaint. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In addition, the facts are viewed in a light most favorable to the plaintiff. *Id.* "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993)).

## III.

"To state a securities-fraud claim under section 10(b), and Rule 10b-5, plaintiffs must plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)[3] (citing *Williams v. WMX*

---

[3]   Section 10(b) provides in relevant part:

It shall be unlawful for any person, directly or indirectly

*Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)). Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements on allegations of fraud and mistake. *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003). Rule 9(b) requires a plaintiff alleging violation of Section 10(b) and Rule 10b-5 to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *Southland*, 365 F.3d at 362 (quoting *Williams*, 112 F.3d at 177-78). Stated broadly, Rule 9(b) requires the complaint to set forth "the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3rd Cir. 2002).

Section 21(D)(b) of the PSLRA, 15 U.S.C. § 78u-4(b), enhanced the pleading requirements for section 10(b) claims in two respects.[4] First, with respect to the misstatement element, the PSLRA

---

. . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5, promulgated by the SEC under Section 10(b) of the 1934 Act, provides in relevant part: HN4It shall be unlawful for any person, directly or indirectly

. . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[4]   The PSLRA provides, in relevant part:

(b) Requirements for securities fraud actions
(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant -

requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is  misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the PSLRA requires that the complaint, "with respect to each act or omission . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the plaintiff does not satisfy the PSLRA's pleading requirements, then the Court must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).[5] Defendant argues that the Complaint fails to satisfy the latter of these

---

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

(3) Motion to dismiss; stay of discovery

(A) Dismissal for failure to meet pleading requirements

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

---

[5]  These heightened pleading requirements under the PSLRA serve important ends. "In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).

14

requirements, *i.e.* a strong inference of scienter.

**A.**

The state of mind or "scienter" required for a section 10(b) claim is a "'mental state embracing intent to deceive, manipulate, or defraud.'" *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Under the PSLRA, "allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter." *Abrams*, 292 F.3d at 430. However, plaintiffs need not plead facts showing actual knowledge of falsity or intent to deceive on the part of the defendants. A strong inference of "severe recklessness" will suffice. *Id.*; *Nathenson*, 267 F.3d 400, 407 (5th Cir. 2001).

The "severe recklessness" threshold is not met by simple negligence "or even inexcusable negligence." *Abrams*, 292 F.3d at 430. Rather, it is satisfied only by "those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* The court must look to the Complaint *in toto* in deciding whether it adequately pleads scienter. *Goldstein*, 340 F.3d at 246-47. *See also Abrams*, 292 F.3d at 431 (stating that scienter allegations "should not be read in isolation, but taken as a whole to see if they raise the necessary strong inference of scienter").

In this case, Plaintiff pleads that E&Y knew or was reckless in not knowing that its unqualified opinion accompanying Seitel's financial results in its 10-K for the year ended December 31, 2000, was materially false and misleading in that Seitel's financial statements did not comply

15

with GAAP and E&Y's audit did not comply with GAAS. (Instrument No. 154, at ¶ 4). Defendant

E&Y argues, however, that Plaintiff has failed to plead facts giving rise to a strong inference of

scienter, and that mere allegations of GAAP violations, standing alone, are not sufficient to establish

that E&Y acted with scienter. (Instrument No. 156, at 9). Defendant's contention is well founded.

In *Abrams*, the Fifth Circuit held exactly as E&Y contends – *i.e.,* that "the mere publication

of inaccurate accounting figures or failure to follow GAAP, without more, does not establish

scienter." *Abrams*, 292 F.3d at 432. But rather, to satisfy the PSLRA, plaintiffs must allege specific

facts supporting a strong inference that the defendant either "knew that it [was] publishing materially

false information, or [was] severely reckless in publishing such information." *Id.* However, this does

not mean that

> a misapplication of accounting principles or a restatement of financials can never
> take on significant inferential weight in the scienter calculus; to the contrary, when
> the number, size, timing, nature, frequency, and context of the misapplication or
> restatement are taken into account, the balance of the inferences to be drawn from
> such allegations may shift significantly in favor of scienter (or, conversely, in favor
> of a nonculpable state of mind).

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000).

In *MicroStrategy*, the court held that plaintiffs alleged sufficient facts to create a strong

inference of scienter where the defendant company allegedly overstated its revenues for seven

consecutive quarters, due to the company's improper recognition of revenues from contracts that had

not yet been finalized. *Id.* This allegation, the court noted, went "well beyond merely alleging that

MicroStrategy misapplied accounting principles . . . by alleging in some detail the magnitude of the

restated financials and the pervasiveness and repetitiveness of MicroStrategy's GAAP violations;

the simplicity of the accounting principles violated . . .; and the importance of the contracts

involved." *Id.* at 636.

### 1.

While a financial restatement by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, "significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter." *Newby v. Lay (In re Enron Corp. Secs.)*, 258 F. Supp. 2d 576, 626 n.55 (S.D. Tex. 2003) (quoting *Chalveras v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999)).[6] Here, the Complaint alleges that the Seismic Data Group at Seitel formed the core of Seitel and generated more than 80% of Seitel's total revenue during the Class Period. (Instrument No. 154, at ¶ 27). The Complaint further alleges that the sheer magnitude of the restatement reduced Seitel's revenues for the first nine months of 2001 by 30% from $140.8 million to $98.1 million. (*Id.* at ¶ 115). For the year ended December 31, 2000, Seitel restated and reduced its revenue by 15% from $163.8 million to $138.3 million. (*Id.*) The Complaint further alleges that, of the $68.2 million in revenue reductions, $50.8 million related to revenues improperly recognized under seismic data access and license agreements. (*Id.*).

As a result of the restatement and based on the delayed implementation of SAB 101, the

---

[6] *See also In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (finding that "the magnitude of the [restatement or of the violation of GAAP] error can play a role" in creating a strong inference of scienter); *In re E.Spire Communications, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 745, 749 (D. Md. 2001); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.), cert. denied, 531 U.S. 1012 (2000) (noting that the improper accounting must constitute a significant percentage (e.g., 20%) of the company's total assets); *MicroStrategy*, 115 F. Supp. 2d at 638-39 (E.D. Va. 2000) ("scienter requires more than a misapplication of accounting principles" but can "take on significant inferential weight" through such factors); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) ("The sheer magnitude of the restatements of Sunbeam's financial statements suggest that Arthur Andersen should have known or was severely reckless not to know that its Unqualified Audit Opinion was misleading.").

Complaint alleges that Seitel could no longer comply with certain financial covenants, and that Seitel could no longer borrow under its line of credit facility. (*Id.* at ¶ 120, 126). In addition, the Complaint alleges that the restatement resulted in a net loss for the year 2000 of $2.5 million instead of net income of $20.4 million. (*Id.* at ¶ 115). The restatement for the year 2001 period resulted in a net loss of $11.6 million rather than a previously reported net income of $2.8 million. (*Id.*). The Court finds that the magnitude of the restatement, in this case, significantly contributes to a finding of scienter. However, the Complaint does not conclude with a mere allegation concerning the magnitude of the restatement. Rather, the Complaint further alleges that the nature and context of the GAAP violation contributes to a finding of scienter.

### 2.

The Complaint specifically references an Audit Strategies memorandum dated December 21, 2000 (approximately 3 weeks after Seitel retained E&Y), in which "E&Y admitted that there was no accounting literature specific to the seismic industry but justified ignoring SAB 101's clear requirements and, instead, [used] the more-favorable revenue-recognition literature specific to the movie industry." (*See* SOP 00-2 "Accounting by Producers or Distributors of Films") (*Id.* at ¶ 38). The Audit Strategies Memorandum contains a detailed discussion of "Seitel's Seismic Data Revenue Recognition Process," showing that E&Y recognized that the revenue recognition process presented a significant accounting issue for Seitel. (Instrument No. 156, Exh 10, at A1-1). The E&Y Audit Strategies Memorandum further includes detailed "summaries of SAB 101 and SOP 00-2 as well as analysis applying SOP 00-2 to Seitel and the Seismic industry." (*Id.* at A1-2 - A1-5). However, Seitel's Class-Period SEC filings, including Seitel's Form 10-K for the year ended December 31,

18

2000, all fail to disclose and nowhere mention that Seitel used SOP 00-2 or any other accounting standards specific to the <u>movie</u> industry. While E&Y devoted a significant portion of its Audit Strategies Memorandum to explain how SOP 00-2 satisfied the requirements of SAB 101, investors never received the opportunity to view this explanation. The investors only received the benefit of a brief statement that "[t]he Company implemented SAB 101 as of October 1, 2000 without a material impact on the quarterly or annual results of operations." (*Id.* at ¶ 72).

E&Y argues that the allegations of the Complaint affirmatively disprove scienter, because the Complaint "pleads correctly that Seitel disclosed its revenue recognition policy." (Instrument No. 156, at 9). Specifically, E&Y points to the fact that the Form 10-K for the year ended December 31, 2000, discloses:

> Revenue from seismic data licensing agreements is recognized when each seismic data program is available for use by the licensees, and is presented net of revenue shared with the other entities.

(*Id.*). E&Y argues that no scienter could exist because this is the particular method that Seitel actually used to recognize revenue, and the market was aware of it. However, the 2000 Form 10-K did not fully disclose the SOP 00-2 accounting policy that E&Y and Seitel used to recognize the revenue. Along these lines, the Complaint specifically alleges:

> Further, Seitel failed adequately to disclose its accounting policy for revenue recognition, in violation of GAAP and Accounting Principles Board Opinion No. 22, *Disclosure of Accounting Policies*, which notes that "information about the accounting policies adopted by a reporting entity is essential for financial statement users" and requires that "a description of all significant accounting policies of the reporting entity [] be included as an integral part of the financial statements." In violation of this GAAP provision, Seitel and E&Y failed to disclose, among other things, that Seitel was improperly using accounting standards that were specific to the <u>movie</u> industry and totally unrelated to Seitel's seismic data business (see SOP 00-2 "Accounting by Producers or Distributors of Films").

19

(Instrument No. 154, at ¶ 139(d)). *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004) (finding complaint adequately alleged scienter where accounting schemes "were misleading precisely because they gave the appearance of compliance for reporting purposes") (footnote omitted).[7]

In addition, the Complaint alleges that the minutes of a February 13, 2001 meeting of Seitel's Audit Committee indicates that there was "considerable" discussion concerning revenue recognition issues, including SAB 101, and that E&Y assured the members of the committee that it "was not suggesting changes to revenue recognition, but rather, pointing out the need for the Company to properly document and be able to support its revenue recognition policies." (*Id.* at ¶ 54). This statement again suggests that E&Y recognized the importance of SAB 101 to Seitel's revenue recognition policies, and also recognized the significant possibility that Seitel's revenue recognition policies would come under close scrutiny. However, E&Y continued to hide the fact that Seitel based its revenue recognition policies on accounting standards directly applicable to the movie industry, and not on accounting literature specific to the seismic data industry. The Court finds that the alleged nature of E&Y's GAAP violations further constitutes evidence contributing to a strong inference of scienter.[8]

---

[7]   This case is distinguishable from *Bay v. Palmisano*, 2002 WL 31415713; 2002 U.S. Dist. LEXIS 20848; Fed. Sec. L. Rep. (CCH) P92,268; Civil Action No. 01-0949 (E.D. La. Oct. 24, 2002). In *Bay*, the court found that defendant had "repeatedly and precisely disclosed to investors its method for recognizing revenue." In this case, the Complaint alleges that Seitel falsely stated (at the insistence of E&Y) that it had implemented SAB 101 and that "[r]evenue received in advance of being earned is deferred until earned." (Instrument No. 154, at ¶ 72). In addition, the Complaint specifically alleges that Seitel and E&Y failed to disclose that Seitel improperly recognized revenues using movie industry standards, totally unrelated to the seismic data industry. (*Id.* at ¶ 71).

[8]   E&Y argues that the appliation of SOP 00-2 as opposed to a more conservative application of SAB 101 merely amounts to a difference in interpretation on how to apply accounting principles. However, E&Y's argument is unavailing because the issue of whether an accounting rule requires interpretation cannot be determined without a fully-developed factual record, including expert testimony. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) ("Because the accounting questions in this case are disputed, dismissal was not appropriate . . . such fact-bound defenses

20

**3.**

The Complaint further alleges that, had E&Y made "specific and reasonable inquiries" of Andersen, as was required under Generally Accepted Auditing Standards ("GAAS"), it would have learned that Andersen had determined that Seitel's accounting violated GAAP and that Andersen had been fired because it had refused to back down from this conclusion. (Instrument No. 154, at ¶ 143). Specifically, the Complaint alleges a confidential source who was a Seitel vice president in Seitel's Houston office until April 2002, informed Plaintiff's counsel that a new, younger auditor from Andersen "began to ask questions" about Seitel's accounting, and "refused to sign off" on the audit. (*Id.* at ¶ 47).[9] According to the confidential informant, the new Andersen auditor told Seitel's management, including Frame and Valice, that Seitel's accounting was not in conformity with GAAP and asked them to change it. (*Id.*). In response, the Complaint alleges that no changes were made to the accounting, Andersen was dismissed, and E&Y was hired. (*Id.*).

The Complaint does not go as far as to allege that E&Y <u>actually knew</u> that the Andersen auditor informed Seitel's management that Seitel's accounting was not in conformity with GAAP. Rather, the Complaint alleges "E&Y was aware, as of December 2000, that Seitel's accounting was not in conformity with GAAP because, among other things, GAAS (specifically AU 315) required E&Y to make 'specific and reasonable inquiries' of Andersen . . ." and "[c]onducting an inquiry that

---

cannot succeed at the pleading stage."); *accord In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998).

[9]  "[T]he complaint need not name [confidential sources] so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief . . ." *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002). Here, the Complaint adequately identifies the confidential source as "a Seitel vice president located in Seitel's  Houston office until April 2002." (Instrument No. 154, ¶ 47).

E&Y was required to do under GAAS would have necessarily revealed that Andersen had determined that Seitel's revenue recognition policies were not in conformity with GAAP and that as a result of their refusal to change this determination, Andersen was fired." (*Id.* at ¶ 143). In support of this argument, the Complaint further alleges that "[a]ccording to Scott Keene, who was the Andersen Principal on Seitel's 1999 year-end audit, when E&Y took over the Seitel audit, as part of its GAAS-required 'inquiry,' E&Y chose neither to contact nor to interview him." (*Id.*). Plaintiff argues that "[t]he fact that Andersen's principal engagement partner on the Seitel audit was not interviewed by E&Y forcefully demonstrates that in violation of GAAS, E&Y did not make any inquiry at all after it replaced Andersen as Seitel's auditor and is a further indication that at a minimum E&Y acted recklessly." (Instrument No. 158, at 21 n.12). *See Abrams*, 292 F.3d at 430 (finding that plaintiffs need not plead facts showing actual knowledge of falsity or intent to deceive, rather a strong inference of "severe recklessness" will suffice).

E&Y argues, however, that it had no reason to question the nature of Seitel's change in auditors, because Seitel's public filing about the change in auditors affirmatively stated that Andersen and Seitel "did not have any disagreement on any matter of accounting principles or practices." (Instrument No. 156, at 11; Instrument No. 154, at ¶ 46). E&Y further argues that the Complaint fails to allege whether E&Y talked to any other Andersen accountants, and what, if anything, E&Y in fact did discuss with Andersen accountants about revenue recognition. (Instrument No. 156, at 11). In sum, Defendant E&Y claims that "the [Complaint's] assertions amount to nothing more than speculation that E&Y 'should have known' about a hypothetical argument between Andersen and Seitel." (*Id.*). The Court agrees, that standing alone, this portion of the Complaint is not the strongest argument in favor of a finding of scienter.

In *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015 (5th Cir. 1996), the Fifth Circuit addressed an allegation of securities fraud which the plaintiffs attempted to plead scienter by showing that Defendants changed auditors because their former auditors insisted that credits be removed and earnings restated. *Id.* at 1019. The Fifth Circuit held that "the fact that Defendants changed auditors because of a difference in judgment about generally accepted accounting principles does not establish conscious behavior on the part of Defendants." *Id.* at 1021. The court also noted that "the term 'generally accepted accounting principles' . . . is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.'" *Id.* (quoting *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir. 1988)).

In this case, however, the Complaint alleges additional facts, concerning the nature of Seitel's change in auditors, that tends to suggest that E&Y acted with severe recklessness when it issued an "unqualified audit opinion" on Seitel's financial statements. In terms of the timing of the change in auditors, the Complaint alleges that the SEC required prospective compliance with SAB 101, beginning no later than the fourth quarter of 2000. (Instrument No. 154, at ¶ 33). Seitel fired Arthur Andersen and hired E&Y in the same fourth quarter of 2000 when SAB 101 was to take affect. (*Id.*). The Complaint further alleges that E&Y immediately recognized that revenue recognition would be a significant issue in Seitel's audit statement for the year ending December 31, 2000; and that E&Y issued an Audit Strategies Memorandum (prior to conducting an audit) that affirmatively showed Seitel how it would avoid SAB 101's requirements by using accounting standards for the movie industry. (*Id.* at ¶ 38). The Complaint further alleges that E&Y made it a point to give Seitel

23

additional assurances that its audit would remain consistent with what Seitel had been doing, and that E&Y would not change the revenue recognition policies of Seitel. (*Id.* at ¶ 55).

In addition, the Complaint alleges that Seitel exhibited a number of "fraud risk factors" noted in the American Institute of Certified Public Accountants ("AICPA") Statement of Auditing Standards No. 82, which suggest a high risk of material misstatement of Seitel's financial statements due to fraud. (*Id.* at ¶ 147). These "fraud risk factors" include the situations in which (i) "the compensation of each of the members of the Management Group was based in significant part on Seitel's achievement of certain financial criteria;" (ii) "Seitel had, in the past, been criticized for unusually aggressive accounting" practices; (iii) "certain members of senior management had outlandish lifestyles that would have been apparent to E&Y auditors;" and (iv) that "Seitel fired Arthur Andersen as its auditor when Andersen confronted Seitel with the fact that its accounting was not in conformity with GAAP." (*Id.*).

Viewing the alleged facts in the light most favorable to the Plaintiff under the totality of the circumstances, and accepting as true the allegations contained in Plaintiff's Complaint, the Court finds that the Complaint sufficiently alleges facts to create a strong inference of scienter. *See Baker*, 75 F.3d at 196; *Goldstein*, 340 F.3d at 246-47.

## B.

Defendant E&Y argues that Plaintiff cannot satisfy the pleading requirements for loss causation and reliance. In the context of 10b-5 claims, loss causation generally requires a plaintiff to allege sufficient facts to show that the alleged misrepresentations proximately caused plaintiff's

injury. *See Southland*, 365 F.3d at 362; 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under [the PSLRA], the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").

Recently, the United States Supreme Court, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), addressed the pleading requirements for loss causation in a fraud-on-the-market case. In *Dura*, purchasers of stock in a pharmaceutical company filed a securities fraud class action, alleging that the defendants made misrepresentations about future FDA approval of a new asthmatic spray device, and that the misrepresentations led them to purchase Dura securities at an artificially inflated price. *Id.* at 339-40. On the final day of the purchase period, the defendants disclosed that the earnings would be less than anticipated, largely because of slow sales; eight months later they announced that the FDA would not approve the device. *Id.* The complaint asserted only that "'*In reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby.*" *Id.* at 340 (emphasis in the original).

The district court dismissed the case, finding that the complaint failed to adequately allege loss causation. *Id.* at 340. The Ninth Circuit reversed, finding that a plaintiff can satisfy the loss causation requirement simply by alleging that a security's price at the time of purchase was inflated because of the misrepresentation. *Id.* The Supreme Court reversed the Ninth Circuit, holding that in fraud-on-the-market cases, alleging that a misrepresentation caused an inflated purchase price does not, by itself, suffice to plead loss causation. *Id.* at 342 ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss"). The Court explained that:

> as a matter of pure logic, at the moment the transaction takes place, the plaintiff has
> suffered no loss; the inflated purchase payment is offset by ownership of a share that
> *at that instant* possesses equivalent value. . . . But if, say, the purchaser sells the

25

shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. . . .

. . . .

Given the tangle of factors, affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss. But, even if that is so, it is insufficient. To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires. 15 U.S.C. § 78u-4(b)(4).

*Id.* at 343 (emphasis in original).

The Supreme Court conceded that the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Id.* at 346. But, the Court explained that the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Id.* The Court further observed that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* Ultimately, the *Dura* Court found the district court's dismissal appropriate, because of the complaint's "failure to claim that Dura's share price fell significantly after the truth became known," and "nowhere else provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's 'spray device.'" *Id.* at 347.

In this case, the Complaint more than adequately pleads loss causation under *Dura*'s "notice" pleading standard. First, the Complaint alleges that Plaintiff "purchased the common stock of Seitel

during the E&Y Class period at artificially inflated prices and was damaged when the truth about

Seitel's improper accounting was revealed and, as a result, the price of Seitel common stock dropped

significantly." (Instrument No. 154, at ¶ 12).

The Complaint further alleges a series of partial disclosures that caused the truth to begin to

"leak out" and "make[] its way into the market place," causing the share price to fall significantly.

*See Dura*, 544 U.S. at 342. Thus, the Complaint alleges partial disclosure of the truth concerning

Seitel's accounting and the resulting drop in stock price as follows:

> In early 2002, Seitel's revenue recognition accounting began to be questioned by
> Wall Street analysts. As a result of these criticisms: the investing public began to
> learn the truth about Seitel's improper accounting, Seitel's stock price began to
> decline, and some of the artificial inflation in Seitel's stock price began to decline,
> and some of the artificial inflation in Seitel's stock price began to be reduced. Thus,
> for example, on January 2, 2002, Seitel's shares closed at $14 per share; by March
> 1, 2002, the price had declined to $8.20 per share. Plaintiff and other members of the
> E&Y Class who purchased prior to this time were damaged by this decline in Seitel's
> share price.

(*Id.* at ¶ 101). Similarly, on February 14, 2002, one of Seitel's competitors announced a restatement

that caused Seitel's stock price to decline. The Complaint alleges that this constituted a partial

disclosure as follows:

> PGS's restatement of revenues from "library card" contracts substantially similar to
> Seitel's caused the market price of Seitel shares to fall, further reducing the artificial
> inflation in Seitel shares. Thus, Seitel's closing price on February 13, 2002, the day
> before PGS's announcement, was $9.36 per share. Over the next two days, on higher
> than usual volume, Seitel's shares dropped almost 12% to $8.24 per share. Plaintiff
> and other members of the E&Y Class who purchased prior to this time were damaged
> by this decline in Seitel's share price.

(*Id.* at ¶ 106).

On April 1, 2002, Seitel announced the restatement. (*Id.* at 115). E&Y argues that Plaintiff

cannot adequately plead loss causation, because "Seitel's stock price increased when it announced

the restatement and did not decline in any meaningful way until it announced disappointing revenues for the first quarter of 2002." (Instrument No. 156, at 17). E&Y further argues that "[t]his increase in stock price accompanying the restatement defeats Plaintiff's ability to plead loss causation or presumed reliance." (*Id.*). However, in *Dura*, the Supreme Court did not adopt the argument that a plaintiff must show that the stock price declined due to a specific corrective disclosure or financial restatement. Rather, the *Dura* Court only suggested that the plaintiff's economic loss may occur as the "relevant truth begins to leak out" or after the truth makes its way into the market place," and the plaintiff need only give "some indication" of the causal link between that leaked truth and his economic loss. *Dura*, 544 U.S. at 344-46. *See, e.g., Enron Corp. Secs. v. Enron Corp.*, 2006 U.S. Dist. LEXIS 50129, *18-19, Civil Action No. 01-3624 (S.D. Tex. July 24, 2006) ("Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud through a number of sources: *e.g.*, from whistle blowers, analysts' questioning of financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."); *In re Bradley Pharmaceuticals, Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (rejecting Defendants' "rigid and dogmatic interpretation" that there must be a "true corrective disclosure" and concluding that "*Dura* did not address what type of events or disclosures may reveal the truth" or "how specific such a disclosure must be" or "set forth any requirements as to who may serve as the source of the information" or "that the disclosure take a particular form or be of a particular quality").

In addition, the Complaint directly addresses why the stock price did not immediately decline on the day of the April 1, 2002 press release. The Complaint alleges "[d]ue to Wall Street analysts' criticism of Seitel's accounting, which began in early 2002 and PGS's earlier restatement, the

28

investing public was not totally surprised by the <u>fact</u> of Seitel's restatement." (Instrument No. 154, at ¶ 122). The Complaint further alleges that the April 1, 2002 press release, itself, was incomplete and deceptive. While the press release stated that "as a result of the restatement" Seitel was not in compliance with its loan covenants, the press release attempted to minimize the impact of this news by explaining that the company had received a waiver and an amendment from senior note holders "that places [Seitel] in compliance with those agreements." (*Id.* at ¶ 120). "Thus, the press release implies that these debt covenant issues would not significantly impact Seitel." (*Id.*). Bolstering this impression, the announcement stated that while Seitel was not in a position "to offer reasonable projections of revenues and earnings for the first quarter, or for the full year," Seitel "expects that year-over-year revenues will be higher and that the Company will be profitable for FY 2002." (*Id.*). Thus, the Complaint alleges, that "analysts had no reason to downgrade the stock and Seitel and E&Y were able to continue to keep hidden the severe impact the restatement and the accounting change would have on Seitel going forward." (*Id.*).

The Complaint further provides additional detailed information on the alleged final link in the chain of partial disclosures, causing damage to Plaintiff:

> The May 3, 2002 press release and Form 8-K also revealed for the first time the severe effect Seitel's new, *proper* accounting was having on its reported revenues and financial condition going forward. Thus, the release stated that "due to increased interest expense and decreased revenues in the first quarter of 2002, the Company will not be in compliance with various covenants . . . as of March 31, 2002." Significantly, the release also warned for the first time that "[t]he Company's outside auditors have advised that unless the Company successfully cures the non-compliance through amendments to the covenants, <u>the auditors will include [a] 'going concern' qualification</u> of any future report."
>
> The reaction to this news was swift. Seitel's shares, which had a closing price of $9.02 on Friday, May 3, 2002, before the issuance of the press release, fell to only $5.65 at the end of the day on Monday, May 6, 2002. . . . The May 3, 2002 press

release was the final corrective disclosure removing all remaining artificial inflation in Seitel's stock price that was caused by Seitel's and E&Y's materially false and misleading statements. Plaintiff and the E&Y Class were damaged when, on this date, the truth about Seitel's accounting became known and, as a result, Seitel's share price fell significantly.

(*Id.* at ¶ 126-27) (emphasis in original).

"Guided by a pragmatic understanding of *Dura*, the Court concludes that Plaintiffs have adequately pled loss causation. The revelation of the 'truth' about [Seitel's revenue recognition policies] did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events." *In re Bradley Pharm.*, 421 F. Supp. 2d at 828-29 (finding that "[t]he February 28, 2005 announcement partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what the April 27 Press Release later confirmed."); *see also Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 U.S. Dist. LEXIS 376, Civil Action No. 04-1107 (N.D. Ill. Jan. 7, 2005) (crediting as "partial disclosures of prior misrepresentations and omissions" the company's issuance of a press release announcing a lawsuit, a SEC and DOJ investigation against the defendants).

E&Y argues, however, that "[t]he loan covenant violations disclosed in Seitel's May 3 announcement were not the result of Seitel's decision to defer revenue, but the result of an actual real-dollar decrease in revenues (and increase in interest expense) as of March 31, 2002." (Instrument No. 156, at 19). In support of this argument, E&Y contends that "Seitel's real revenues declined by 40 percent over the comparable quarter," and "[b]ecause Plaintiff cannot articulate any basis for attributing that 40 percent decline in revenues to the restatement, he cannot plead that the restatement caused the loss for which he sues, and his claims must be dismissed for failure to plead reliance and loss causation." (*Id.*). Defendants fact-based argument disputes the allegations in the

Complaint and, therefore, requires a fact-specific inquiry at the summary judgment or trial stage. But such an argument is not appropriately made at this stage on a Rule 12(b)(6) motion to dismiss. *See Baker*, 75 F.3d at 196 (explaining that in determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the court accepts as true all allegations contained in the plaintiff's complaint, and views the facts in a light most favorable to the plaintiff). *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73, 175 (2d Cir. 2005); *Barrie*, 397 F.3d at 257-58 (noting that the court "must assume the truth of the allegations pleaded with particularity in the compliant," and "[t]he strong-inference pleading standard does not license [the court] to resolve disputed facts at this stage of the case."). Accordingly, the Court rejects Defendant E&Y's argument that Plaintiff has not sufficiently pled loss causation and reliance.

## IV.

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss the Second Consolidated Amended Class Action Complaint Against Ernst & Young Only **(Instrument No. 156)**, is **DENIED**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ___ day of August, 2006, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

31