IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE: SEITEL, INC. SECURITIES          §
LITIGATION                              §
                                        §     **CONSOLIDATED CIVIL ACTION**
                                        §     **CIVIL ACTION NO. H-02-1566**

**O R D E R**

Pending before the Court is Plaintiffs' Motion for Class Certification. **(Instrument No. 179).**
The Court heard oral argument from the parties on the motion on April 13, 2007.

**I.**

This suit was originally filed in 2002 as a securities class action against Seitel, Inc. ("Seitel"),
certain of its current and former officers and directors (the "Management Group"), and Ernst &
Young LLP ("Defendant" or "E&Y"), alleging fraudulent accounting practices and false statements
regarding the timing of revenue recognition, in violation of Section 10(b) and 20(a) of the Securities
Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.  (Instrument
Nos. 1, 72).   Specifically, Dr. Russell Semeraro ("Lead Plaintiff" or "Dr. Semeraro") alleged on
behalf of himself and all other persons or entities who purchased Seitel common stock on the open
market, other than Seitel, the Management Group, and E&Y, that from April 2, 2001, through May
3, 2002 (the "Class Period"), Seitel and E&Y materially misrepresented Seitel's results for the year
ending December 31, 2000, by improperly recognizing revenues and thereby materially inflating
Seitel's revenues and profits.  (Instrument No. 72).

On May 6, 2005, this Court preliminarily certified the suit as a class action for purposes of
effectuating a settlement agreement between Dr. Semeraro, on behalf of the class, and Seitel and the
Management Group (together, the "Settling Defendants").  (Instrument No 131).  On July 29, 2005,

the Court granted final approval for certification of the class as against the Settling Defendants only and approved the proposed partial settlement between those parties. (Instrument No. 150). On that same day, with the claims between the class and the Settling Defendants resolved, Dr. Semeraro, individually and on the behalf of all others similarly situated, filed a Second Consolidated Amended Class Action Complaint (the "Complaint") against the sole non-settling defendant, E&Y.[1] (Instrument No. 154).

On September 27, 2005, E&Y filed a motion to dismiss Plaintiffs' Complaint. (Instrument No. 156). On August 29, 2006, this Court issued an order denying E&Y's motion to dismiss. (Instrument No. 161). The order on the motion to dismiss also explained, at length, the background of this case as well as Plaintiffs' allegations against E&Y and that order is adopted by reference. In summary, however, this case arises out of claims against Seitel , a Delaware corporation based in Houston. (Instrument No. 154, at 7). At all relevant times, Seitel's common stock actively traded on the New York Stock Exchange, and, as is required of publicly-traded companies, Seitel filed quarterly and annual reports with the Securities and Exchange Commission ("SEC"). (*Id.*).

On December 3, 1999, the staff of the SEC issued Staff Accounting Bulletin 101 ( "SAB 101"), *Revenue Recognition in Financial Statements*, which reiterated the accounting principle that revenue should not be recognized by publicly-traded companies until earned and that revenue is generally not earned until "delivery has occurred or services have been rendered." (Instrument No. 154, at 13). The SEC required prospective compliance with SAB 101, beginning no later than the

---

[1]     For clarification purposes, this Court did not certify the class as to E&Y when it certified the class as against the Settling Defendants.  E&Y was not included in the group of Settling Defendants.

2

fourth quarter of 2000. (*Id.*). SAB 101 also summarized certain of the staff 's views in applying Generally Accepted Accounting Principles ("GAAP") to revenue recognition in financial statements to ensure that registrants were in compliance with the SEC's interpretation of GAAP. (*Id.*).

On December 1, 2000, Seitel issued a Form 8-K disclosing that Seitel had replaced Arthur Andersen LLP ("Andersen") with E&Y as its independent accounting firm. (Instrument No. 154, at 19). The Form 8-K further reported that Andersen and Seitel did not have any disagreement on any matter of accounting principles or practices." (*Id.*). However, according to a confidential source who was a vice president in Seitel's Houston office until April 2002, Seitel dismissed Arthur Andersen as its auditors because a new auditor from Andersen informed the President of Seitel, Paul Frame ("Frame"), and the Chief Financial Officer of Seitel, Debra Valice ("Valice"), among others, that Seitel's accounting violated GAAP, and "refused to sign off" on the audit. (*Id.*, at 19-20). According to the vice president, the changes were not made, Andersen was dismissed, and E&Y was hired. (*Id.*).

On March 5, 2001, Seitel issued a press release, announcing its purported financial results and performance for the fourth quarter and year ended December 31, 2000. The press release highlighted strong revenue and reported that revenue had increased 27 percent for the year. Seitel's stock, which opened on the New York Stock Exchange at $20.00 per share on March 5, 2001, traded as high as $23.00 per share during the next couple of days. (Instrument No. 154, at 23-24).

On April 2, 2001, the commencement of the proposed Class Period, Seitel filed an Annual Report on Form 10-K for the year ended December 31, 2000 (the "2000 Form 10-K"). The 2000

3

Form 10-K confirmed the favorable financial results that Seitel reported on March 5, 2001. (Instrument No. 154, at 26). Within the 2000 Form 10-K, E&Y issued an "unqualified" audit opinion on Seitel's December 31, 2000 financial statements. [2] (*Id.*). According to the Complaint, E&Y 's unqualified opinion falsely represented that Seitel's financial statements had been prepared in conformity with GAAP and that its audits had been conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). (*Id.*).

In early 2002, certain Wall Street analysts also began to question Seitel's revenue recognition accounting, and Seitel's stock price began to decline. In response, Seitel hired another independent auditing firm to principally help "improve the public image of Seitel," by working with Seitel on a "white paper" which explained and justified Seitel's revenue recognition practices. (Instrument No. 154, at 38-39).

On April 1, 2002, Seitel issued a press release announcing that Seitel was restating financial results for the unaudited first three quarters of the year 2001, and for the year ended December 31, 2000, supposedly because it had "newly adopted more conservative and transparent accounting practices." (Instrument No. 154, at 42). According to the April 1, 2002 press release, Seitel restated and reduced its revenue for the first nine months of 2001 by 30%, from $140.8 million to $98.1 million. The restatement for this period resulted in a net loss of $11.6 million rather than previously reported net income of $2.8 million. For the year ended December 31, 2000, Seitel restated and

---

[2]     "An unqualified opinion, the most favorable report an auditor may give, represents the auditor 's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *In re Worldcom, Inc. Sec Litg.*, 346 F. Supp. 2d 628, 643 n.17 (S.D.N.Y. 2004) (quoting *United States v. Arthur Young & Co* , 465 U.S. 805, 818 n.13 (1984)).

reduced its revenue by 15%, from $163.8 million to $138.3 million. The restatement for this period resulted in a net loss of $2.5 million instead of net income of $20.4 million. Of the $68.2 million in revenue reductions, $50.8 million related to revenues improperly recognized under seismic data access and license agreements. (*Id.*, at 43).

In the April 1, 2002 press release, Seitel also acknowledged that "as a result of the restatement" Seitel was not in compliance with certain financial covenants as of September 30, 2001, and December 31, 2001, and that Seitel was therefore not able to borrow under its line of credit facility. (Instrument No. 154, at 47). However, according to the Complaint, the press release minimized the impact of this news, explaining that "[t]he Company has received a waiver and an amendment from the Senior Note holders that places it in compliance with those agreements," and "[t]he Company has begun discussions with the lenders on [the] line of credit [facility] to amend the covenant calculations to bring Seitel back into compliance and to permit borrowing under the line of credit facility. (*Id.*). The release also stated that while Seitel was not "at this time in a position to offer reasonable projections of revenues and earnings for the first quarter, or for the full year," Seitel "expects that year-over-year revenues will be higher and that the Company will be profitable for FY 2002." (*Id.*). Thus, the Complaint alleges analysts had no reason to downgrade [*sic*] the stock and Seitel and E&Y were able to continue to keep hidden the full impact the restatement and the accounting change would have on Seitel going forward. (*Id.*).

On April 4, 2002, Seitel filed its Annual Report on Form 10-K for the year ended December 31, 2001 (the "2001 Form 10-K"). Contrary to Seitel's and E&Y's statement one year earlier, that

Seitel had implemented SAB 101 as of October 2000, Seitel admitted that it had not, in fact, implemented SAB 101. (Instrument No. 154, at 47; Instrument No. 156, Exh 2).

The Complaint asserts that the dire effects of the restatement and Seitel's change to SAB 101 accounting continued to remain hidden until four weeks after the announcement of the restatement. (Instrument No. 154, at 49-50). On May 3, 2002, after the market closed, Seitel issued a press release and also filed with the SEC a Form 8-K. The May 3, 2002, release stated that "following its consultations with the SEC Staff during April 2002, the Company explains that its previously announced restatement of revenues in relation to certain seismic data access and license agreements is based on SAB 101." (*Id.*). The May 3, 2002 press release and Form 8-K also revealed for the first time the severe effect Seitel 's new, *proper* accounting was having on its reported revenues and financial condition. (*Id.*, at 50) (emphasis in original). Additionally, the release warned that "[t]he Company's outside auditors have advised that unless the Company successfully cures the non-compliance through amendments to the covenants, the auditors will include [a] 'going concern' qualification on any future report." (*Id.*).

Seitel's shares, which had a closing price of $9.02 on Friday, May 3, 2002, after the end of trading, fell to $5.65 at the end of the day on Monday, May 6, 2002. (Instrument No. 154, at 50-51). (Instrument No. 161, at 1-11).

Lead Plaintiff and class representative Dr. Semeraro now seeks certification of this suit as a class action on behalf of himself and the members of the proposed class. (Instrument No. 179, at 5). The proposed class consists of all persons and entities, other than E&Y and any affiliates, who acquired common stock of Seitel during the Class Period (from April 2, 2001 through May 3, 2002).

6

(Instrument No. 179, at 1). Dr. Semeraro is joined in the motion for class certification by additional proposed class representatives Karl Gleason Fenner ("Fenner") and Jerry L. Fitzgibbons ("Fitzgibbons") (collectively, the "Plaintiffs").[3] (*Id.*).

In their motion for certification, Plaintiffs contend that the putative class members were "damaged by defendant Ernst & Young's violations of the federal securities laws," because E&Y "materially misrepresented Seitel's results for the year [ending] December 31, 2000, by improperly recognizing revenues and thereby materially inflating Seitel's revenues and profits." (Instrument No. 179, at 2). Specifically, Plaintiffs argue that the "improper revenue recognition related largely to Seitel's improper practice of using <u>movie</u> industry accounting guidance to record revenue on data licensing contracts." (*Id.*). Plaintiffs assert that "[n]ot only was this practice not properly disclosed, it was also not in conformity with generally accepted accounting principles ("GAAP")." ( *Id.*). Plaintiffs further argue that "E&Y's audit was not in conformity with generally accepted accounting standards ("GAAS"), in contrast to E&Y's unqualified opinion." (Instrument No. 179, at 2). Plaintiffs contend that "E&Y knew or was reckless in not knowing that its unqualified opinion accompanying Seitel's financial results in its 10-K for the year ending December 31, 2000, was materially false and misleading in that Seitel's financial statements did not comply with GAAP and E&Y's audit did not comply with GAAS." (*Id.*, at 3). Plaintiffs conclude that as a result of "Seitel and E&Y's misrepresentations, the market price of shares of Seitel common stock was materially inflated" to the detriment of the putative class members during the Class Period. (*Id.*, at 2).

---

[3]     On January 12, 2007, Fenner and Fitzgibbons filed a joint motion to intervene in this action as proposed named plaintiffs and class representatives. (Instrument No. 174). On February 13, 2007, this Court granted their motion to intervene, thereby deeming Fenner and Fitzgibbons named class representatives in this action. (Instrument No. 183).

Plaintiffs seek certification of the proposed class under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiffs contend that certification is appropriate because the requirements of Rule 23 are fully satisfied. Specifically, Plaintiffs contend that: (1) the class is sufficiently numerous; (2) common questions of law or fact exist; (3) the proposed class representatives' claims are typical of those of the class; and (4) the proposed class representatives are or will be adequate representatives of the class. (Instrument No. 179, at 10-15). Plaintiffs further assert that a class action would be a superior means of adjudicating Plaintiffs' claims and that common questions of law or fact predominate over any questions affecting individual members of the proposed class. (*Id.*, at 16-19). For these reasons, Plaintiffs ask that the Court find "this case to be a proper class action maintainable on behalf" of the proposed class, that they each be certified as class representatives and that Wolf Popper LLP be appointed as class counsel. (*Id.*).

In response, Defendant Ernst & Young asserts that certification would be inappropriate because Plaintiffs can not satisfy certain Rule 23 requirements. (Instrument No. 185, at 1). Specifically, E&Y argues that Plaintiffs can not satisfy the Rule 23(b)(3) requirement that common questions of law or fact predominate over any questions affecting individual members of the proposed class. (*Id.*, at 7-11). E&Y also contends that Plaintiffs, as the proposed class representatives, do not have claims typical to the proposed class, as required by Rule 23(a)(3). (*Id.*, at 11-13). E&Y additionally asserts that Plaintiffs, as the proposed representatives, are not adequate representatives of the proposed class, as required by Rule 23(a)(4). (*Id.*, at 13-19). E&Y concludes that for any or all of these reasons, certification is clearly inappropriate.

E&Y further argues that if the Court nevertheless certifies the class, that the proposed Class Period (from April 2, 2001 through May 3, 2002) should be shortened. (Instrument No. 185, at 19-20). E&Y submits that April 1, 2002, the day that Seitel publicly disclosed that its "financial statements published April 2, 2001 were materially in error," rather than May 3, 2002, should be the end date of the Class Period. (*Id.*). E&Y asserts that the end date of the Class Period should be the same date that Seitel publicly disclosed the curative information regarding its prior financials. In other words, since Seitel made the corrective disclosure on April 1, 2002, E&Y contends the proposed Class Period should cover the period of time from April 2, 2001 through April 1, 2002. (*Id.*).

## II.

Rule 23(c)(1) of the Federal Rules of Civil Procedure requires that the district court determine "as soon as practicable" after the initiation of an action brought on behalf of a class, whether the action should be maintained as a class action. Fed. R. Civ. P. 23(c)(1); 5 Moore's Federal Practice § 23.61[1]. "A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). The party seeking the class certification bears the burden of proof. *Id.*; *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001), *clarified on reh'g en banc*, 279 F.3d 313 (5th Cir. 2002). To be certified, the class must meet all the requirements of Rule 23(a), as well as the requirements of one of the subsections of Rule 23(b). 5 Moore's Federal Practice § 23.61[1]. The district court has broad discretion in deciding to certify, and will be reversed on appeal only for abuse of discretion. *Castano*, 84 F.3d at 740; 5 Moore's Federal Practice § 23.61[1]. In determining

whether a class should be certified, the court may not inquire into the merits of the suit, but may nevertheless "look past the pleadings" to assess whether the Rule 23 requirements have been met. *Castano,* 84 F.3d at 744.

## III.

### A.

In order to be certified as a class action, Plaintiffs must first show that the putative class meets the requirements set forth in Federal Rule of Civil Procedure 23. Under Rule 23(a), a putative class must be "so numerous that joinder of all members is impracticable"; that there be "questions of law or fact common to the class"; that the class representatives' claims be typical of the claims of the class; and that the class representative and class counsel fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

### 1.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticable does not mean impossible, rather that joinder would be "extremely difficult or inconvenient," and depends on the circumstances of the case, not merely the sheer numbers of putative class members. 5 Moore's Federal Practice § 23.22[1], [2]; *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir. 1981). Relevant factors include: geographic dispersion of the class members; the ease of identification of the class members; the nature of the action; the size of each individual plaintiff's claim; and the effect of injunctive relief on future class members. *Zeidman,* 651 F.2d at 1038. In order to prove numerosity, the moving party must proffer some evidence of the number of class members or a reasonable estimate. *Id.*; 5

Moore's Federal Practice § 23.22[3][b]. However, the numerosity requirement is "generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman*, 651 F.2d at 1039.

Plaintiffs argue that the proposed class includes 2,219 investors.[4] "These 2,219 investors reside in all 50 states, the District of Columbia, and eleven countries outside of the United States." (Instrument No. 179, at 11; *see* Instrument 179 - *Affidavit of Thomas Glenn*). Thus, according to Plaintiffs, there are at least 2,219 geographically dispersed members of the putative class, making joinder impracticable and demonstrating that the numerosity requirement has been met. Defendants do not contest Plaintiffs' assertion. Accordingly, the Court finds that the class is "so numerous that joinder" would indeed be impracticable and that the putative class satisfies the numerosity requirement.

**2.**

Rule 23(a)(2) states that there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement tests the sufficiency of the class itself. 5 Moore's Federal Practice § 23.23[3]. The test for commonality is not stringent; the class need only share one common question of law or fact to satisfy the requirement. 5 Moore's Federal Practice § 23.23[2]; *see also Forbush v. J.C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (explaining that the "interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the

---

[4] After approval of the partial settlement, Seitel investors sent proof of claim forms to the claims administrator. According to the claims administrator, 2,219 of the investors who sent in their claim forms purchased Seitel shares during Plaintiffs' proposed Class Period, held at least some of their shares through the end of that period and submitted recognized claims. (Instrument No. 179, at 11).

putative class members'"). Because the requirement for establishing commonality is not difficult, "courts usually do not spend a great deal of time addressing [it], but instead focus on the related issue under Rule 23(b)(3) of whether common issues *predominate* over individual ones." *In re Ford Motor Co. Bronco II Prod. Liability Litig.*, 177 F.R.D. 360, 366 (E.D. La. 1997) (emphasis in original).

Here, Plaintiffs list five specific questions of both law *and* fact, common to every member of the class, including:

(a)   whether the federal securities laws were violated by E&Y's acts as challenged in the Complaint;

(b)   whether E&Y's unqualified opinion in Seitel's 2000 Form 10-K falsely represented that Seitel's financial statements had been prepared in conformity with GAAP and that its audit has been conducted in accordance with GAAS;

(c)   whether E&Y acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

(d)   whether, during the proposed Class Period, the market price of Seitel common stock was artificially inflated due to the material misrepresentations and/or non-disclosures complained of in the Complaint; and

(e)   whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

(Instrument No. 179, at 12; Instrument No. 154, at 65). Plaintiffs contend that any of these questions of law or fact ably satisfy the commonality requirement and E&Y does not challenge Plaintiffs' assertion. Due to this element's integration in the Rule 23(b)(3) analysis, the Court will assume for present purposes that there is at least one common issue among the proposed class members and that the commonality requirement is satisfied.

12

**3.**

Next, Plaintiffs must show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement focuses on the relationship between the interests of the representative parties and the interests of the class as a whole. 5 Moore's Federal Practice § 23.24[1] (stating that "if the legal theories of the class representative conflict with those of the absent class members, that lack of typicality precludes certification of the class"). Typicality is satisfied if the representative's claims arise from the same events, practice, or conduct as the class plaintiffs. 5 Moore's Federal Practice § 23.24[2]. "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics as that of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." 5 Moore's Federal Practice § 23.24[4]. The test of typicality, like that of commonality, is not demanding. *Forbush*, 994 F.2d at 1106.

Plaintiffs contend that the claims of the proposed representatives, Dr. Semeraro, Fenner and Fitzgibbons, "arise from the same course of conduct and are predicated on the same legal theories as the claims of all other class members." (Instrument No. 179, at 13). Plaintiffs argue that this Court concluded as much, at least with regards to Dr. Semeraro, when it certified the class on May 6, 2005, with Dr. Semeraro as Lead Plaintiff for the purpose of effectuating the settlement between the class and the Settling Defendants. (Instrument No. 131). Plaintiffs contend that nothing has changed which should lead the Court to conclude otherwise now. (Instrument No. 179, at 13).

13

However, Defendant E&Y contends that the proposed class representatives' respective purchases of Seitel common stock during the Class Period creates a conflict between the class representatives themselves. Specifically, Defendant argues that Fenner bought stock only after February 14, 2002 while Dr. Semeraro bought stock only before that date. (Instrument No. 185, at 12). Defendant points out that Dr. Semeraro asserted in the Complaint that Seitel issued a restatement on February 14, 2002, thereby causing a reduction or elimination of the alleged artificial inflation of Seitel's common stock. (*Id.*). If true, according to Defendant, this would substantially reduce the damages of Fenner, for example, who only bought stock after this date – thereby creating a conflict between Fenner and Semeraro as to the degree of artificial inflation of the stock at the times of their respective purchases. (*Id.*). Defendant argues that this conflict is substantial enough to destroy typicality and/or the yet to be addressed Rule 23(a)(4) adequacy requirement. (*Id.*, at 13).

Although Defendant E&Y's argument that Dr. Semeraro and Fenner, for example, may have different stakes in this litigation is plausible, in the securities fraud/class action context, "certain minimal levels of antagonism must be tolerated." *In re Seagate Tech. II Sec. Litig.*, 843 F.Supp. 1341, 1361 (N.D. Cal. 1994). Furthermore, "[t]ypicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the . . . theories of those whom they purport to represent." *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997), *cert. denied*, 522 U.S. 1052 (1998). Here, the proposed class representatives' claims arise from a similar course of conduct and are in fact predicated upon the same legal theory as all of the members of the putative class – that being that E&Y materially misrepresented Seitel's results for the year ending December 31, 2000, causing an artificial inflation in Seitel's revenues and the value of its common stock. The

14

factual differences relating to when they purchased their Seitel shares and whether they were impacted differently by Seitel's restatements are not at loggerheads with a finding of typicality. *See* 5 Moore's Federal Practice § 23.24[4]. Accordingly, the Court finds that the typicality requirement has also been satisfied.

**4.**

Finally, the Court must determine if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy test functions to reveal conflicts between the representatives and the class members they claim to represent. *Amchem Prods., Inc. v. Windsor*, 117 S. Ct. 2231 (1997). Due process requires that the rights of absent class members be protected, as absent members are bound by the class action judgment. 5 Moore's Federal Practice § 23.25[1]. Adequacy of representation is tied to both commonality and typicality. *Amchem*, 117 S. Ct. at 2251 n.20. The adequacy requirement of Rule 23(a)(4) applies to both the class representative and the representative's counsel. *In re Asbestos Litig.*, 90 F.3d 963, 977 (5th Cir. 1996).

**a.**

The class representative(s) must not have interests adverse to the class. Courts consider whether the named representative(s) share common interests with other class members; however, the interests of the representatives and the other members need not be identical. 5 Moore's Federal Practice § 23.25[4][b]. The Court considers whether the named representatives will "vigorously prosecute" the interests of the class through the class counsel. *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). Absent specific proof to the contrary, the adequacy of class counsel

15

is presumed. *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 410 (N.D. Miss. 2000) (citing *Falcon v. General Tel. Co. of the Sw.*, 626 F.2d 369, 376 n.8 (5th Cir. 1980)).

Here, there is no indication that the class representatives interests' diverge or are adverse to the interests of the class. However, Defendant argues that the class representatives, and particularly Fenner, are inadequate class representatives because they are grossly unfamiliar with the facts of this case and do not understand this litigation. (Instrument No. 185, at 16-19). Class representatives "must satisfy the Court that they, and not counsel, are directing the litigation." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). To do this, class representatives must show themselves to be sufficiently informed about the litigation to manage the litigation effort. *Id.*

E&Y argues that the deposition testimony of Fenner and Fitzgibbons clearly demonstrate that they are not apprised of the facts and details of this litigation, nor are they exerting any sort of control over the litigation. (Instrument No. 185, at 14-15). For example, in Fenner's deposition, he conveyed that he was essentially relying on Wolf Popper, proposed class counsel, to familiarize him with the claims in this case and that he had not, up to that point, given direction to Wolf Popper on the course of the litigation. (Instrument No. 185, Tab C, at 74-76, 106 - *Oral Deposition of Karl Fenner*). Similarly, Fitzgibbons stated that he had not read any of the documents that had been filed in this suit, only vaguely demonstrated an understanding of the allegations against E&Y and agreed to be a class representative for the primary purpose of recovering his investment. (Instrument No. 185, Tab D - *Oral Deposition of Jerry L. Fitzgibbons*, at 26-32, 72). Additionally, neither Fenner nor Fitzgibbons expressed any awareness of the costs and expenses related to this litigation or Wolf Popper's fees. Furthermore, with regards to Dr. Semeraro, E&Y argues that he unfortunately suffers

from a rare form of bone marrow cancer, forcing him to not engage in physical activity and rendering him with short-term memory loss. (Instrument No. 185, at 15-16).

In contrast, Plaintiffs contend that the class representatives are willing and able to adequately represent the interests of the class. (Instrument No. 179, at 14). Plaintiffs argue that particularly Dr. Semeraro has "amply demonstrated" his willingness and ability by the fact that he appeared and testified as part of his lead plaintiff motion and that he supervised Plaintiffs' counsel in the Bankruptcy Action, where he obtained class certification for the proof of claim filed on behalf of his class, aggressively pursued his Objection to the Plan, and ultimately, obtained a $5.25 million [dollar] partial settlement with Seitel and the Management Group. (*Id.*). Furthermore, Dr. Semeraro, conscious of his health and its potential implications, "prudently worked with counsel to propose additional qualified class representatives" to attempt to make sure that the interests of the class do not go unrepresented, should he have to someday alter his involvement in this action. (*Id.*, at 15). Fenner and Fitzgibbons were ultimately selected to be the additional class representatives.

Plaintiffs contend that Fenner and Fitzgibbons are both seasoned businessmen and experienced investors with a substantial financial stake in this litigation, and that they have both avowed to "take an active role in and control the litigation and to protect the interests of absentees." (Instrument No 179, at 14). Fitzgibbons especially demonstated a high-level of understanding and knowledge regarding markets, accounting and securities. (Instrument No. 185, Tab D - *Oral Deposition of Jerry L. Fitzgibbons*).

Plaintiffs also point out that Fenner and Fitzgibbons were each deposed within two days after this Court granted their motion to intervene and that both were testifying about their involvement in

17

this litigation up to that point in time – and that after being appointed as a class representative, both would become more engaged. (Instrument No. 186, at 7). Moreover, Plaintiffs stress that all three class representatives declared their willingness to vigorously pursue the interests of the class. (Instrument No. 179 – *Declarations of Russell Semeraro, Jerry L. Fitzgibbons* and *Karl Fenner*).

On these facts, the Court finds that the proposed representatives will adequately protect the interests of the class. Dr. Semeraro, as Lead Plaintiff, has thus far done a commendable job of representing the proposed class and the Court has no reason to suspect that his commitment will change, his health condition notwithstanding. However, even in consideration of Dr. Semeraro's health condition, he is now joined by two other named representatives, Fenner and Fitzgibbons, seasoned businessmen who have expressed a functional understanding of this suit and the allegations against E&Y. To the extent that Fenner and Fitzgibbons equivocated about some of the more detailed or nuanced aspects of this suit and/or expressed a reliance on counsel, the Court notes that they were both deposed within two days of being permitted to intervene in this action; and many of the documents in this case were under seal and consequently unavailable to them for review prior to that time. Yet and still, "class representatives need not be legal scholars and are entitled to rely on counsel," provided they demonstrate knowledge that is not acquired solely from counsel – which the Court finds that both Fenner and Fitzgibbons have done. *Berger*, 257 F.3d at 483. In sum, the Court finds that the interests of Dr. Semeraro, Fenner and Fitzgibbons are common to and co-extensive with the interests of the class and that they are "sufficiently informed about the litigation to manage the litigation effort." *Unger*, 401 F.3d at 321.

**b.**

Class counsel must be qualified, experienced, and generally able to conduct the litigation.  5 Moore's Federal Practice § 23.25[5][a].  In assessing the adequacy of class counsel, the Court may consider the counsel's past record in other litigation, experience, and the particular expertise of the counsel.  5 Moore's Federal Practice § 23.25[5][b][ii]; *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

Plaintiffs claim that Wolf Popper LLP, counsel for all three class representatives, "has a proven track record in the prosecution of class actions and has successfully litigated many major class action cases."  (Instrument No. 179 – *Affidavit of Carl Stine In Support of Class Certification Motion*).  Plaintiffs' assertion is supported by counsel's detailed listing of Wolf Popper's litigation history in prior class actions.  Morever, Defendant E&Y does not raise a specific challenge to the competency or experience of Plaintiffs' counsel.  Accordingly, the Court finds that proposed class counsel Wolf Popper LLP is adequate and will capably represent the interests of the class.

**B.**

A class action may be maintained if it meets the four prerequisites of Rule 23(a) and falls within one of the three categories of Rule 23(b).  Fed. R. Civ. P. 23(b).  Rule 23(b) provides for three types of class actions.  Classes under Rule 23(b)(1) and 23(b)(2) usually concern actions requesting equitable relief, while 23(b)(3) classes are actions for damage claims.  5 Moore's Federal Practice § 23.40[1].  Plaintiffs claim that they can maintain this class action under 23(b)(3), because this case involves common questions of law or fact which predominate over any individual questions.  (Instrument No. 179, at 16).

1.

a.

Rule 23(b)(3) requires that the Court determine whether common issues of law or fact predominate over individual issues. "[A]lthough reminiscent of the commonality of Rule 23(a)," the Rule 23(b)(3) predominance requirement, "is 'far more demanding' because it 'tests whether [a] proposed class [is] sufficiently cohesive to warrant adjudication by representation.'" *Unger*, 401 F.3d at 320 (quoting *Amchem*, 521 U.S.at 623-24). "Determination of predominance goes to the root of why class certification motions lie within the discretion of the district court, because a determination of predominance requires a common sense judgment regarding what the case is really about, and whether it would be more efficient to try the case as a class suit." *Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc.*, Civ. A. No. 82-2534-T, MDL No. 584, 1987 WL 15884, *4 (D. Mass. July 30, 1987). "No rote formula can determine the answer to this inquiry." *Id.*

Plaintiffs contend that because "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust law," they can readily demonstrate predominance through the fraud-on-the-market theory of securities fraud which they allege. *Amchem*, 521 U.S. at 625; (Instrument No. 179, at 16). Plaintiffs submit that they can accomplish this by availing themselves of "the class-wide presumption of reliance permitted by the fraud-on-the-market theory." *Barrie v. Intervoice-Brite, Inc.*, Civ. A. No. 3:01-CV-1071-K, 2006 WL 2792199, at *5 (N.D. Tex. Sept. 26, 2006).

The fraud-on-the-market theory of securities fraud is based on the hypothesis that, "in an open and developed securities market, the price of a company's stock is determined by the available

material information regarding the company and its business." *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160-61 (3rd Cir. 1986)). The theory assumes that in an efficient market, the market price of a stock reflects all public information, so that an investor who purchases a stock in such a market is harmed if the price of that stock reflects false information as a consequence of a material misrepresentation. *Intervoice-Brite*, 2006 WL 2792199, at *5. The theory therefore postulates that material misleading information will, in an efficient market, presumably defraud investors even if investors have not directly relied on the misleading information. *Basic*, 485 U.S. at 241-42 (quoting *Peil*, 806 F.2d at 1160-61).

To take advantage of the presumption of reliance, fraud-on-the-market plaintiffs must establish that a defendant made material misrepresentations or omissions concerning a security that actively traded in an efficient market. *Basic*, 485 U.S. at 249-50; *see also Unger*, 401 F.3d at 322 (stating that investors' reliance on the integrity of the market may be presumed "when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market"). Specifically, factors relevant to determining whether the presumption is available are: (1) did the defendant make material public misrepresentations; (2) did the plaintiffs trade shares between the time the misrepresentations were made and the time the truth was revealed; and (3) were the company's shares traded in an efficient market. *Intervoice-Brite*, 2006 WL 2792199, at *5; *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 (5th Cir. 2004). If fraud-on-the-market plaintiffs are not able to establish that they are entitled to the presumption, questions of individual reliance (on the alleged fraudulent misrepresentations) predominate and the proposed class can not be certified. Fed. R. Civ. P. 23(b)(3); *see Castano*, 84 F.3d at 745 (stating that "a fraud class action cannot be certified

when individual reliance will be an issue"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 413 (5th Cir. 2001) (generally explaining that reliance is a "*causa sine qua non*" for fraud-on-the-market plaintiffs).

However, if and when the presumption of reliance is established, it may thereafter be rebutted by "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248; *see also Greenberg*, 364 F.3d at 661-62. This includes any showing that the market price was unaffected by the alleged misrepresentations. *Greenberg*, 364 F.3d at 661-62.

When considering class certification based on a fraud-on-the-market theory, the court must engage in a thorough analysis, weigh the relevant factors, require both parties to justify their allegations and base its ruling on admissible evidence. *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 310 (5th Cir. 2005) (citing *Unger*, 401 F.3d at 325). Plaintiffs argue that they "more than adequately allege that the fraud-on-the-market presumption is applicable," and as such, that the Rule 23(b)(3) predominance requirement is satisfied. (Instrument No. 179, at 17). Plaintiffs first contend that E&Y gave an unqualified opinion that was materially false and misleading as to Seitel's fiscal year 2000 financials and which falsely represented that Seitel's financial statements had been prepared in conformity with GAAP. (*Id.*). Seitel subsequently restated those same financials which E&Y had given an unqualified opinion upon, thereby demonstrating that, according to Plaintiffs, Seitel's financials contained material, incorrect accounting errors and satisfying element one of the fraud-on-the-market theory. (*Id.*). Plaintiffs secondly argue that all of the class representatives traded shares during the Class Period, satisfying element two. Plaintiffs lastly contend that Seitel's shares traded in an efficient market, satisfying element three. (*Id.*).

While assessing the first two elements is a relatively straightforward inquiry, courts look to a non-exhaustive list of factors to determine whether a stock traded in an efficient market: (1) the average weekly trading volume expressed as a percentage of outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock. *Bell*, 422 F.3d 307, 310 n. 10 (citing *Unger*, 401 F.3d at 323). These factors must be weighed analytically by the district court, because they each represent a different facet of market efficiency. *Intervoice-Brite*, 2006 WL 2792199, at *6 (citations omitted).

As evidence that Seitel's stock traded in an efficient market, Plaintiffs point to the Declaration of Michael A. Marek ("Marek"), a founding member of Financial Markets Analysis, LLC, a securities analysis firm. (Instrument No. 179, Exh. 6 – *Declaration of Michael A. Marek*, at 1). Marek declares that his firm is frequently called upon "to prepare reports and to testify as securities valuation experts in class actions" on matters including market efficiency, loss and damage causation, and the valuation of publicly traded securities based upon the hypothetical absence of alleged misstatements and the disclosure of alleged misrepresentations and omissions. (*Id.*). After assessing the market information relevant to Seitel during the Class Period, Marek concludes, with a supporting analysis of his opinion, that "the market for Seitel common stock during the Class Period can be characterized

23

as efficient." (*Id.*, at 3). Likewise, Defendant's expert, E. Allen Jacobs, Ph.D. ("Dr. Jacobs"), who assessed the market in which Seitel's stock traded in during the proposed Class Period, also agreed with Marek that the "market for Seitel common stock was efficient during the period in question." (Instrument No, 185, *E. Allen Jacobs Declaration*, at 3). During oral argument, E&Y echoed their concession that Seitel's stock traded in an efficient market. With both parties' experts in agreement that Seitel's stock traded in an efficient market, the Court accepts their analyses and finds that Seitel's stock traded in an efficient market.

Consequently, at first blush, it would seem that Plaintiffs have indeed shown that the fraud-on-the-market presumption of reliance is applicable here, and consequently, that they have satisfied the Rule 23(b)(3) predominance requirement. It is undisputed that Seitel publicly restated its fiscal year 2000 financials which E&Y had earlier given an unqualified upon, presumptively satisfying element one – the material public misrepresentations prong. It is similarly unchallenged that the putative class members traded Seitel shares during the Class Period, satisfying element two. Lastly, both parties agree that Seitel's shares traded in an efficient market. With all three elements seemingly satisfied, Plaintiffs assert that they have met their burden, that they are entitled to the fraud-on-the-market presumption of reliance and that the predominance requirement has therefore been met.

However, Defendant E&Y argues that, even at the certification stage, more must be shown by Plaintiffs to trigger the presumption and to correspondingly satisfy the predominance requirement. Defendant argues that as a precondition to certification, Plaintiffs must demonstrate not only all three aforementioned elements, but *also* that E&Y's alleged misrepresentations caused actual movement in Seitel's stock price. (Instrument No. 185, at 7). Defendant contends that a growing line of cases

clearly support this argument, specifically *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d at 661-62, and more recently, the Fifth Circuit's opinion in *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, No. 05-10791, 2007 WL 1430225, *3-7 (5th Cir. May 16, 2007).[5]

In *Greenberg*, an opinion issued in 2004, the Fifth Circuit affirmed in part and vacated in part a district court's finding at the *summary judgment* stage that the fraud-on-the-market plaintiffs were not entitled to the presumption of reliance. The court explained that for plaintiffs to recover "in cases depending on fraud-on-the-market theory, [ ] the complained of misrepresentation or omission [must] have actually affected the market price of the stock[.]" *Greenberg*, 364 F.3d at 662 (quoting *Nathenson*, 267 F.3d at 415). The court emphasized that a causal relationship between an alleged misrepresentation and the actual movement of a stock's price is required. *Id.* Where fraud-on-the-market plaintiffs can not demonstrate a causal connection between a complained of misrepresentation or omission and "the *actual movement* of [the] stock price," the court concluded that they are not entitled to the presumption of reliance. *Id.* at 663 (emphasis added).

However, the scope and/or applicability of *Greenberg*, which addressed a district court's findings at the summary judgment stage, to the instant case, which is presently at the class certification stage, was, until recently, somewhat mercurial. For example, *Greenberg* did not address whether that holding was to be applied with equal force at the class certification stage – which would have constituted a change in the law. Despite its clear mandates, *Greenberg* did not expressly set forth a (new) bright line that fraud-on-the-market plaintiffs must show actual movement at the class

---

[5]     The *Oscar* case was issued after the Court heard oral argument from the parties and while Plaintiffs' motion for class certification was *sub judice*.

certification stage as a precondition to invoking the presumption and consequently demonstrating predominance.

However, since the Court heard argument on this motion, the Fifth Circuit announced that *Greenberg's* actual movement requirement is, in fact, equally applicable to fraud-on-the-market plaintiffs at the class certification stage. In *Oscar Private Equity Inv. v. Allegiance Telecom, Inc.*, the court clarified that fraud-on-the-market plaintiffs must show, at the certification stage, that an alleged misrepresentation "*actually moved*" the market. 2007 WL 1430225, at \*3 (emphasis in original). The court held that "loss causation must be established at the class certification stage by a preponderance of all admissible evidence" in order to trigger the fraud-on-the-market presumption. *Id.*, at \*6. Loss causation involves a demonstration that a corrective disclosure, and not some other contemporaneously released information, "caused a significant amount of the decline" in a stock's price. *Id.*, at \*7. The court explained that where plaintiffs can not demonstrate loss causation/actual movement in a stock's price, they are not entitled to the presumption of reliance and resultantly, the proposed class should not be certified. *Id.*

E&Y argues that under both *Greenberg* and *Oscar*, Plaintiffs can not demonstrate predominance here because they can not show any actual movement/loss causation in Seitel's stock price relative to E&Y's alleged misrepresentations. According to E&Y, to demonstrate actual movement in Seitel's stock price, Plaintiffs must show (1) a statistically significant stock price increase when the allegedly false statements were made or (2) a statistically significant price decrease when the truth of the allegedly false statements were revealed. *Greenberg*, 364 F.3d at 665-66. Additionally, per *Greenberg* and *Oscar*, Plaintiffs must demonstrate that the stock price movement

26

was more likely than not caused by E&Y's actionable misrepresentations, rather than some other unrelated event(s). *Id.*; *see also Oscar*, 2007 WL 1430225, at *6-8; (Instrument No. 185, at 8). Defendant argues that Plaintiffs can show neither an increase nor a decrease in Seitel's stock, relative to E&Y's alleged misrepresentations, and that without this showing, Plaintiffs are not entitled to the fraud-on-the-market presumption of reliance, which is necessary to demonstrate predominance and which in turn is indispensable for certification of the class. *Castano*, 84 F.3d at 745; *see also Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, Civ. A. No. 06-20856, 2007 WL 816518, at *7 (5th Cir. March 19, 2007).

In support of this argument, Defendant points to the fact that when it published its audit opinion on April 2, 2001, Seitel's stock price dropped by five percent, rather than rose – reflecting that the market understood and properly interpreted E&Y's unqualified opinion. (*Id.*, at 8). Defendant asserts that because Plaintiffs can not show an increase in price following the allegedly false positive statement of E&Y, it follows that Plaintiffs can not establish the presence of any artificial inflation in the stock price. (*Id.*). Defendant argues that in this case, Seitel's stock price suffered a substantial decline upon publication of E&Y's allegedly false statement on April 2, 2001 – which undermines Plaintiffs' argument that the falsely positive statement caused an inflation in the stock price.

Defendant argues alternatively that neither can Plaintiffs show that Seitel's stock price declined after a restatement corrected E&Y's alleged misstatement. (Instrument No. 185, at 9). Defendant contends that approximately one-year after E&Y had issued its allegedly false audit opinion on April 2, 2001, Seitel published its restated financials – on April 1, 2002 – revealing that

27

Seitel had sustained a net loss, not a net profit, for the fiscal year ending December 31, 2000.  (*Id.*).

E&Y contends that on this day, Seitel's stock price increased by seventeen percent, demonstrating

that the original E&Y opinion issued the prior year had not caused any artificial inflation in the value

of Seitel's stock.  That is, on April 1, 2002, the market responded positively to Seitel's restatement,

because at that time, the market was correctly evaluating Seitel's stock price and was already

informed as to Seitel's accounting practices, however flawed they were.  (*Id.*).  Defendant further

asserts that any number of other factors and information releases may have contributed to Seitel's

stock movement during the proposed Class Period, well apart from E&Y's audits, which further

dilute the argument that E&Y's actions were the but for cause of any alleged stock inflation.  (*Id.*,

at 9-11).

In further support of its argument, E&Y points to the Declaration of Dr. Jacobs.  (Instrument

No, 185, *E. Allen Jacobs Declaration*).  Although Dr. Jacobs agrees that the market in which Seitel's

common stock traded in during the relevant period was efficient, he contends that there was no stock

price inflation created by and through Defendant's alleged misconduct.  Specifically, Dr. Jacobs

asserts that how Seitel accounted for its revenue was known to the market "before, during and after

the proposed class period."  (*Id.*, at 4).  Dr. Jacobs argues that because the market operated

efficiently and because there was no information which was unknown to the market regarding Seitel's

accounting standards, the initial statement concerning Seitel's earnings and the subsequent

restatement one year later did not contain nor present new information to the market – resulting in

no inflation in Seitel's stock price at any time.  This in turn explains the atypical reaction in Seitel's

stock price, which decreased by five percent in April 2001 following the release of the falsely *positive*

statement and yet increased by seventeen percent in April 2002 when Seitel *restated* its earnings. In Dr. Jacobs' expert opinion, the market already knew that Seitel's use of SAB 101 accounting was problematic and the market's reactions to Seitel's falsely positive statement and subsequent restatement represented the market's understanding that Seitel's revenue recognition would be proper moving forward.

Plaintiffs respond that the very fact of how E&Y's misstatements affected Seitel's stock valuation in an efficient market is a common question of fact predominating over all members of the class – thereby demonstrating predominance. (Instrument No. 186, at 2). Plaintiffs further argue that the lack of immediate price movement in the stock upon the release of E&Y's opinions (decreasing when E&Y released its unqualified opinion; increasing when Seitel restated its financials a year later) does not mean that E&Y's allegedly material misrepresentations had no affect on the stock price. (*Id.*, at 3). Indeed, to the contrary, Plaintiffs' expert Marek contends that Plaintiffs' claim "establishes the *possibility* of artificial stock price inflation under the fraud-on-the-market theory as of the beginning of the Class Period." (*Id.*, Exh. A – *Reply Declaration of Michael A. Marek*, at 7) (emphasis added). Plaintiffs assert that E&Y's liability in this case rests upon E&Y's unqualified audit opinion in which it knowingly and falsely stated that Seitel's accounting complied with GAAP – and the impact of this can not be overlooked, because it is quite certain that if E&Y had told the market by way of an adverse opinion that Seitel's accounting did not, in fact, comply with GAAP, "there is little doubt that Seitel's share price would have dropped significantly." (*Id.*, at 3-4).

The Court finds that *Oscar* forecloses all of the Plaintiffs' arguments. In *Oscar*, the Fifth Circuit addressed similar arguments submitted by the plaintiffs in that case, who asserted that the

29

predominance requirement could be satisfied by "a generalized inquiry into whether the misrepresentation moved the stock, an inquiry common to all members of the class." 2007 WL 1430225, at * 6. The *Oscar* court concluded that because the plaintiff's expert, like Marek here, did not establish the requisite loss causation beyond reasonable speculation, the plaintiffs were not entitled to the presumption. Thus, *Oscar's* edict is unassailable: fraud-on-the-market plaintiffs must demonstrate actual movement/loss causation in a stock's price stemming from an alleged misrepresentation as a prerequisite to triggering the presumption of reliance for certification purposes. Mere speculation, without more, and however reasonable, is simply not enough.

For the foregoing reasons, the Court finds that Plaintiffs have failed to establish that they are entitled to the presumption of reliance under the fraud-on-the-market theory. Plaintiffs have simply not demonstrated through all the evidence submitted to the Court that E&Y's alleged misrepresentations caused any actual movement in Seitel's stock price. Consequently, Plaintiffs have not met their burden of proof to show that common questions of law or fact predominate over any individual issues.

### b.

Rule 23(b)(3) requires that the Court also determine whether a class action is superior to other methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). A class action is a superior way to proceed where joinder of all class members would be impracticable and individual trials would result in unwarranted duplication. *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 182 (E.D. Pa. 1988). In evaluating superiority, the Court must be mindful of several relevant factors, including: (1) class member interest in instituting or

30

controlling individual actions; (2) this Court as the forum for the class action; and (3) the effect certification will have on judicial resources. Fed. R. Civ. P. 23(b)(3); *Castano*, 84 F.3d at 748.

Plaintiffs argue that as a class action seeking redress for geographically dispersed class members for the violation of federal securities laws, there is no feasible option but the class action vehicle. They argue that "the alternatives to a class action are either no recourse for thousands of stockholders to whom the courthouse would thereby be off limits, or a multiplicity of suits resulting in the efficient administration of justice." (Instrument No, 179, at 19). Defendants do not challenge Plaintiffs' assertion.

Accordingly, the Court finds that a class action would be a superior method for the fair and efficient adjudication of this controversy.

**2.**

Rule 23(b)(2) enumerates a list of other relevant factors for the Court to consider: (a) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b). Neither party addresses any of these issues in their filings and even a cursory review of these factors shows that they are satisfied.

31

## IV.

For the foregoing reasons, the Court finds that Plaintiffs have failed to satisfy their burden to establish each of the elements of Rule 23(a) and 23(b)(3).  Accordingly, IT IS HEREBY ORDERED that Plaintiffs' motion for class certification is **DENIED**. (**Instrument No. 179**).

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the day of June, 2007, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**